## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | ) |
| v. | )    **Crim. No. 06-227-06 (RBW)** |
| | ) |
| | ) |
| **LAWRENCE  BRYANT** | ) |

### MOTION TO RECONSIDER MAGISTRATE JUDGE'S DETENTION ORDER
### AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Defendant, Lawrence Bryant, through undersigned counsel, respectfully requests that this Court reconsider the Magistrate Judge's Detention Order, and set reasonable conditions of release pending trial in this case.  As grounds for this Motion, defendant states the following:

**FACTUAL AND PROCEDURAL BACKGROUND:**

**Lawrence Bryant's Arrest:**

On or about August 1, 2006, Mr. Bryant learned that there was an outstanding warrant for his arrest, and was advised to contact the F.B.I. to make arrangements to surrender himself.  At approximately 5:00 p.m. on August 1st Mr. Bryant surrendered himself at the F.B.I. Washington Field Office and was taken into custody on the warrant issued as a result of the indictment in this case.  On August 2nd,  Mr. Bryant was arraigned before Magistrate Judge Kay on Count One of the indictment - the only charge against Mr. Bryant in the indictment. [1]   The government requested that Mr. Bryant be detained pending trial under 18 U.S.C. 3142(f)(1)(C).  Mr. Bryant was detained and the detention hearing was scheduled for August 4th.

---

1   Count One charges that between in or about September 2005 and July 2006, Darnell Jackson and twelve other defendants conspired to distribute and possess with intent to distribute a mixture or substance containing a detectable amount of phencyclidine in violation of 21 U.S.C. 846 and 841 (a)(1) and (b)(1)(A).   Counts Two through Four charge Mr. Jackson and other defendants with related narcotics offenses.

2

**Detention Hearing:**

On August 4, 2005, a detention hearing was held before Magistrate Judge Kay for Mr. Bryant and four other defendants - Darnell Jackson, Christopher Dobbins, William Gray, and Bernie Hargrove. The government proceeded by proffer, outlining the allegations against Mr. Jackson and the other defendants. The government did not make an agent available to testify, which is sometimes done when the government decides to proceed by proffer. The government proffered that the government's evidence demonstrated that Darnell Jackson and Troy Hopkings were the leaders of a conspiracy which was bringing large quantities of PCP from California to the District of Columbia, The government proffered that Jackson, Hopkins, and others were traveling to California, where they would meet "T", a PCP supplier who lived in Compton, California. T supplied them with kilogram quantities of PCP, which would then be transported to the D.C. area by female couriers, usually on Jet Blue flights into Dulles airport. The government alleged that its investigation revealed that Jackson and/or Hopkins arranged for approximately 25 shipments in this manner.

The government alleged that flight records from Jet Blue and Southwest Airlines confirmed California travel by Jackson, Hopkins, Bernie Hargrove, and Christopher Dobbins, as well as three of the female couriers. The government further proffered that the PCP was usually distributed in wholesale quantities to customers in the D.C. area at the home of Jackson's sister, or at the Safari Steakhouse - a restaurant in the area.. The government claims to have made a number of controlled buys in the case from Jackson and other defendants. The government also described some of the intercepted telephone calls from a wiretap which was authorized for Jackson's telephone in or about May 2006.

In contrast to the specific evidence of large scale PCP distribution described as to the other defendants, the government's proffer of evidence as to Lawrence Bryant was extremely thin. The government basically set forth five allegations: 1) Mr. Bryant was overheard on the target telephone talking to Jackson about money - often with Jackon complaining about not

3

getting money from Mr. Bryant; 2) Mr. Bryant was overheard on the telephone talking to Jackson about collecting money at Barry Farms before coming to meet him; 3) Mr. Bryant and Mr. Jackson were overheard talking about a cocaine case or conspiracy involving Kirk Carter, and speculating about cooperators and whether they were cooperating because they were not provided assistance in getting better attorneys; 4) Mr. Bryant was observed meeting Mr. Jackson in a location where other drug dealers met him after shipments had arrived from California, and there appeared to be some "exchange"at one or more of those meetings; and 5) Mr. Bryant was overheard making a reference to Alpha Kappa Alpha, which the agents "believed" to be code for the purchase of a gun according to the proffer. [2]

Notwithstanding those allegations, the government conceded that Mr. Bryant appeared to be legitimately employed during the pendency of the alleged conspiracy, and seemed to generally appear in the area or be overheard on the telephone after work. His work hours appeared to be from very early in the morning until late in the afternoon. In addition the PSA report provided verification of much of Mr. Bryant's personal information.  The only negative information in the PSA report is a 1990 drug conviction, but resulted from his arrest seventeen years ago.  He served about two years of a Youth Act sentence, and successfully completed the rest of his sentence under probation supervision.[3]   Since then he has had a very strong record of employment and positive contributions in the community.  The PSA report confirms that he has

---

[2]    The government also proffered that they were concerned that Mr. Bryant misrepresented his assets during the CJA financial inquiry by the Magistrate Judge.  Mr. Bryant described his ownership, along with his wife, in his current home.  The government, again without any documentation or evidence, suggested that Mr. Bryant owned a second home.  However, counsel was able to explain that Mr. Bryant had been the co-signer on his mother-in-law's home, but his name should have come off of that property several years ago.  Counsel has not been provided any documentation which contradicts the explanation provided, and believes that any records suggesting an ownership interest by Mr. Bryant in another property will be shown to be in error.

[3]    The PSA report incorrectly reflected that he served a 6 year sentence, suggesting that he was incarcerated for 6 years.  Counsel is in the process of obtaining the records, which are expected to confirm that he served approximately two years at the Youth Center in Occoquan and was thereafter supervised in the community.

4

very strong ties to the D.C. area. He was born and raised in this area, and now lives in Waldorf, Maryland. He has been employed for the past 15 years, and has had ties to his current employer for most of that time. Counsel spoke with Darryl Smith, his current supervisor, who knows him since 1992. He confirmed that Mr. Bryant is employed by Henkels & McCoy ("H & M"), a network and communications technology company. He indicated that Mr. Bryant is a reliable worker, who is now a supervisor of a number of work crews. He further indicated that H & M is holding his job, at least until his bond conditions can be reconsidered by the Court.

His wife, daughter, aunt, cousins, mother-in-law, and another child's mother all appeared in court on his behalf. In addition, John Green, an attorney with Gilman and Associates, appeared to testify on Mr. Bryant's behalf. Mr. Green represented Mr. Bryant between 2004 and 2006 in a child visitation case brought by Mr. Bryant against the mother of one of his children. Mr. Green testified that Mr. Bryant was very responsible in carrying out the responsibilities associated with the domestic relations matter, and appeared in a timely fashion for the 3 or 4 court hearings in the case. He testified that he was impressed by Mr. Bryant because he sought visitation with his son, is an active parent to all of his children, and provides financial support for all of his children - which is something many of his other clients and many of the young men in the District of Columbia do not do. He had verified Mr. Bryant's employment as supervisor of cable installation crews for a company, although he could not recall the name of the company. Mr. Green was vigorously cross-examined, yet it is obvious that he had a very clear recollection of Mr. Bryant, his family circumstances, the child support calculations for his children, and his compliance with those conditions. Mr. Green expressed the opinion that Mr. Bryant was a responsible person who would comply with any conditions the court might impose.

Finally, counsel proffered that Mr. Bryant had been considered by the Pretrial Services Agency for the electronic monitoring program, and that he was a suitable candidate. In addition, PSA Representative Vaughn Wilson authorized counsel to represent that he was available in his office, and was willing to come to court to prepare the necessary paperwork for the program.

5

Also, counsel was able to confirm with the PSA that Mr. Bryant tested negative for drugs following his arrest.

Magistrate Judge Kay summarily granted the government's detention requests as to all five defendants without making any particularized findings. He held that the government's proffer had sufficiently established that all five defendants were a danger to the community, and that none of the defendants had rebutted the statutory presumption. In addition, he held that he did not have to reach the issue of flight risk, and ordered each of the defendants detained.

Mr. Bryant disagrees with the Magistrate Judge's detention ruling and is now requesting that this Court review and reconsider the matter. Counsel submits that a more careful and thorough review of the factors in this case will lead this Court to conclude that reasonable conditions of release can be fashioned which will assure that Mr. Bryant is not a danger to the community pending a resolution of the case on the merits. Accordingly, Mr. Bryant requests that reasonable conditions of release be set in his case before he loses his job.

**ARGUMENT:**

Mr. Bryant's strong work history, ties to the community, strong commitment to his children and family, demonstrated responsibility in surrendering himself to the F.B.I., when balanced against a very thin government case and his very dated criminal conviction, clearly rebuts the statutory presumption of dangerousness - particularly since the alleged leaders are now incarcerated and the operation is apparently shut down.[4]  The government's evidence simply falls far short of establishing by clear and convincing evidence that no condition or combination of conditions will reasonably assure Mr. Bryant's appearance in court, and the safety of the community.

---

4  Counsel would note that the wiretap went up in May 2006. Therefore, to the extent that the government's proffer as to Mr. Bryant is based almost entirely on the telephone conversations, the information is from a relatively short period of time. Suspicious conversations as described by the government over a 30 or 60 day period, should not outweigh Mr. Bryant's achievements over a fifteen year period.

6

It appears that Mr. Bryant may be the victim of an indictment based largely on guilt by association. Most of the government's proffer was based on alleged contacts between Mr. Bryant and Darnell Jackson, either by telephone or in person. However, the Court should understand that Mr. Bryant has good reason to talk to Mr. Jackson since they are related, not because he is participating in a narcotics conspiracy with Jackson. He also has good reason to discuss the arrest and prosecution of Kirk Carter, who is charged in a cocaine conspiracy in this court, because he is also related to Kirk Carter. Finally, he has reason a legitimate reason to be in the Barry Farms area since his son and son's mother live there. Even if the conversations show that he talked about owing Jackson money, or about collecting money to pay Jackson, there is no evidence that he actually paid Jackson any money. More importantly, there is no evidence that the monies were for PCP purchases, as opposed to some other loan or debt.

The government has developed theories or beliefs about those conversations, but those theories and beliefs are based on broad speculation and conjecture, not real or direct evidence. We have all been involved in cases in which the government's theories at the time of the arrests or indictment about certain conversations or suspected "code" overheard during a wiretap turn out to be completely wrong. Sometimes they learn that suspicious conversations turn out to be wholly innocent. Defendant submits that a full analysis of the wiretap (whenever the government chooses to disclose the conversations) and the government's evidence will demonstrate that the government's theories are simply unsupported in this case .

The government has returned an indictment against Mr. Bryant and 12 other individuals in this case. The government arrested Mr. Bryant based on that indictment, and as it often does in these cases has used the procedural tools available in this Court to detain him since his arrest. Significantly, they did it without providing any evidence to the court which could stand the test of impeachment or cross examination. In addition, since the indictment is a "bare bones" indictment. Since Count One does not contain any specific allegations or overt acts, the Court knows little, if anything, about the allegations against Mr. Bryant - and certainly far less than it

learns in most multi-defendant conspiracy indictments. There is simply no way to know what the grand jury relied upon when it indicted Mr. Bryant, or whether the alleged drug quantity reasonably foreseeable to Mr. Bryant would be a lesser-included offense of Count One - possibly even an offense without a mandatory minimum penalty.

It is also important to note that the government arrested and detained Mr. Bryant on very thin allegations, and to date has not provided copies of the allegedly incriminating telephone conversations, or with any item of discovery for that matter. [5]  The lack of discovery to date makes it impossible for the defense to fairly challenge the government's proffer. There is no excuse for the government's failure to be ready to provide discovery simultaneous with the arrests of defendants resulting from a long-term investigation, particularly where the evidence is as thin as it is against Mr. Bryant.

Accordingly, defendant submits that the allegations are far too speculative, to detain Mr. Bryant based on the unsupported, untested allegations of the proffer. Counsel further contends that the Magistrate Judge failed to properly consider the many types of evidence which are noticeably missing from the government's proffer in this case - evidence which is reasonably expected in a case such as this case, especially because of the wiretap surveillance. In spite of the lengthy investigation, there were no allegations by the government that it has any direct evidence that Mr. Bryant was a participant in the drug conspiracy as alleged. There is no evidence that he made any drug-related trips to or from California; or that he participated in any controlled buys from either an undercover officer or a confidential informant; or that he participated in the meetings in the D.C. area at which the PCP was allegedly packaged and/or re-distributed. Mr. Bryant was not observed in any known drug transactions or exchanges, and was never observed in possession of PCP. There were no seizures of drugs, drug paraphenalia,

---

5   At the arraignment the defendant requested informal discovery regarding the wiretap telephone calls, seizures, and other evidence supporting the charge against Mr. Bryant. However, no discovery was provided prior to the detention hearing. Prior to the beginning of the hearing the prosecutor provided defense counsel a very brief summary of several telephone calls in which Mr. Bryant was alleged to be a participant. To date no discovery has been provided in the case.

8

weapons, or contraband of any kind from Mr. Bryant or from his property. Even the conversations about the Kirk Carter case are unremarkable. They were not discussing any violence. They were speculating about co-defendants who might not have cooperated with the government if they had been provided better attorneys. A discussion like that about a relative's case, without more, does not prove that Mr. Bryant was involved in the PCP conspiracy charged in this case.

In short, the allegations are based almost entirely on the government's self-serving speculation about, and interpretation of, a handful of conversations - conversations which are suspicious mostly because of what Mr. Jackson is believed to be doing, not because of what Mr. Bryant is doing. Thus counsel urges the court to set reasonable conditions of release, which will allow Mr. Bryant to continue to work and support his four children pending a determination on the merits of the case.

**CONCLUSION:**

Counsel submits that the Magistrate Judge failed to recognize the factors particular to Mr. Bryant's case. The proffer of evidence was far weaker as to him. He is the only one who surrendered himself to police in this case. His very strong personal characteristics, including his employment and record of community achievement for the past 15 years, were far stronger than any of the other defendants at the table that day. Mr. Bryant is the only defendant to present a live witness at the hearing, his domestic relations attorney John Green, who provided strong and compelling character testimony. Even if the evidence were to ultimately show that Mr. Bryant made some mistakes which bring him before the court, he is simply not a risk to flee, and will not be a danger to the community if released on reasonable conditions pending a resolution of the merits of the charges in this case, which is likely to be more than a year away. In short, the record supports a finding that Mr. Bryant rebutted the statutory presumption of dangerousness, and that conditions of release should be set.

9

As the Supreme Court noted, in our society, liberty should be the norm, and pretrial detention should be the carefully limited exception. United States v. Salerno, 107 S.Ct 2095 at 2105 (1987). One of the guiding principles underlying the criminal justice system in this country is the presumption of innocence that applies to all individuals accused of crimes. Moreover, nothing in the bail statute is to be "construed as modifying or limiting the presumption of innocence." 18 U.S.C. 3142(j). It has long been recognized that "unless the right to bail before trial is preserved the presumption of innocence secured only after centuries of struggle, would lose its meaning." Stack v. Boyle, 342 U.S. 1, 4 (1951). If not carefully circumscribed, preventive detention has the potential to seriously undermine the presumption of innocence. Salerno, supra at 2110 (Marshall, J dissenting).

The federal bail statute passes constitutional muster, at least in part, because defendants in federal court are presumed to get a speedy trial. See, Salerno, Supra. Unfortunately, the application of the speedy trial rules in a case such as this one often does not result in a "speedy trial". In fact, in this case the government has already announced that it intends to seek a superseding indictment, which usually delays the setting of a trial date. In addition, since all defendants are not yet in custody, the speedy trial clock has not started to run. Even the filing of this bond motion is likely to be considered as tolling the running of the speedy trial clock. In light of all the relevant factors in a case such as this one, history suggests that it will not be in a posture to go to trial for about a year.

In conclusion, counsel submits that a review of the statutory factors and due process considerations, this Court should re-evaluate defendant's bond status, and set reasonable conditions of release. Specifically, the Court can set conditions, including the PSA electronic home monitoring program, which will reasonably assure that Mr. Bryant is not a danger to the community or a risk to flee.

10

Defendant respectfully requests a hearing in this matter at the Court's earliest convenience.

WHEREFORE, for the above stated reasons, and for any other reasons raised at a hearing on this Motion, the Magistrate Judge's detention order should be vacated, and reasonable conditions of release should now be set.

Respectfully submitted,


_/s/_____
Howard B. Katzoff (Bar # 348292)
717 D Street. NW   Suite 310
Washington, D.C. 20004
Counsel for Lawrence Bryant
(202) 783-6414




## CERTIFICATE OF SERVICE


I hereby certify that a copy of the foregoing Motion was served electronically on Elisa Poteat, Esq., Assistant United States Attorney for the District of Columbia, 555 Fourth Street, N.W.,  Washington, D.C. 20530, and all defense counsel of record,  this  _15th_  day of  _August_ , 2006.


____/s/_____
Howard B. Katzoff