## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. 06-227 (RBW)** |
| | **:** | |
| **LAWRENCE BRYANT,** | **:** | **Judge Reggie B. Walton** |
| **JOHN DOWNS,** | **:** | |
| **Defendants.** | **:** | |

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION FOR RECONSIDERATION OF DETENTION ORDER

*COMES NOW*, the United States of America, by and through its Attorney, the United States Attorney for the District of Columbia, respectfully responds to defendants' motions to have this Court reconsider the decision of Magistrate Judge Alan Kay to hold the defendants pending trial. The magistrate judge found, and the record shows, that no condition nor combination of conditions for defendants' release can reasonably assure the safety of the community. Therefore, we ask the Court to continue to hold the defendants without bail pending trial. In support whereof, we submit as follows:

## BACKGROUND

1.      The government's investigation of the narcotics conspiracy in which these defendants participated has uncovered this large-scale, incredibly prolific, drug trafficking organization operating between California, District of Columbia, the State of Maryland, and the Commonwealth of Virginia. Agents working on the case estimated that, in the last year alone, the group was responsible for the distribution of well over 20 kilograms of phencyclidine ("PCP").

The conspiracy operated to transport gallon quantities of PCP from California to the Washington, D.C. area for re-sale to lower level drug sellers who supplied neighborhood and street-level sellers with PCP. The organization was directed for the most part by DARNELL ANTHONY

JACKSON and TROY HOPKINS. Some members of the conspiracy traveled to Los Angeles, using Long Beach Airport where they perceived the security to be more lax.[1] After arriving in the area of Compton, California, members of the conspiracy would meet with TONY FITZGERALD HILT ("T") who is thought to be a member of the Mona Park Crips and a supplier of large quantities of PCP. Indeed, FITZGERALD'S house and apartments in Los Angeles were searched on August 1, 2006, and agents recovered over four gallons of PCP.

After retrieving the gallon quantities of PCP liquid, the conspirators would take the liquid and place it in common containers, such as shampoo, mouth wash, or body lotion bottles. They would then place these bottles in check-in luggage. The luggage would be carried by a regular group of couriers, some of whom are charged in the Indictment in this case.

The regular couriers traveled frequently between Los Angeles and Dulles Airport during the period of the conspiracy, and flight records reveal over thirty trips by the couriers. It was the practice of the couriers to each carry a gallon of PCP (which equals 3.7 kilograms of PCP) in their bags. Flight records from JetBlue Airways alone reveal that one courier, TINESHA ADAMS, made more than 20 trips in the past 18 months. Others made as many as 11 trips, often in the company of one another.

The Washington area members of the conspiracy took turns traveling to California to pick up the PCP, and pay the couriers. They used Traveler's Moneygram and Western Union wire remitter services, among other methods, in order to advance monies to the couriers. They carried sums of cash on their persons to pay the drug suppliers. It was not uncommon for Washington-based

---

[1] Although TROY HOPKINS had previously flown into LAX and Burbank Airports, following the seizure of three gallons of PCP in January of 2004, by authorities in Los Angeles, the group began flying to Long Beach instead, and even tried to mail PCP back after this interruption.

members of the conspiracy to book and even pay for the California-based couriers' flights. A basic review of the government's evidence reveals that the drug amount contained in the Indictment of 20 kilograms is a grossly conservative figure, with 60 kilograms being closer to actual amount of drugs transported.

JACKSON, the leader of the conspiracy with whom BRYANT had direct phone contact, made numerous trips to Los Angeles, and personally met with the Compton-based supplier, while other conspirators were made to wait for him at hotels. These calls were very cryptic and coded in a manner that is consistent with calls made by narcotics conspirators who are trying to avoid detection. Although BRYANT himself is not known at this time to have traveled to pick up narcotics in California, he certainly had direct contact with the most frequent traveler JACKSON, which is evidence that BRYANT's status in the conspiracy was at a higher level than that of a street-supplier.

During the course of the investigation, JACKSON sold PCP on more than three occasions in controlled buys to a cooperating witness. He was recorded in a car talking at length about the conspiracy, its incredible financial success (more than $500,000 profit one month in particular) and referring to himself proudly as "the starter fluid king."[2] Were there any doubt about the meaning of the coded calls that had dominated the wiretap in May, 2006, this doubt was eliminated when agents seized two gallons of PCP from two of the known couriers at Dulles Airport on May 24, 2006.

Within a short time after that seizure, JACKSON was on the telephone discussing the implications of the seizure with members of the conspiracy, including JOHN DOWNS.

---

[2]    Members of the conspiracy took the PCP they got in California and diluted it using starter fluid and other substances to expand their personal profits. Starter fluid was recovered from several locations during the executions of the search warrants.

Defendant DOWNS was among the members of the conspiracy who traveled to California to buy PCP as recently as July of 2006.  Following his arrest, DOWNS talked with agents from the FBI and admitted his involvement in the instant conspiracy.  Painting himself as a small-time hustler of PCP "dippers," DOWNS sought to minimize his role.  In fact his status in the organization allowed him to travel to Los Angeles to participate in the gallon purchases, not a benefit afforded curbside sellers at the bottom of the conspiratorial pyramid.

At the detention hearing the government proffered the content of the calls and videotapes of a meeting between BRYANT and DARNELL ANTHONY JACKSON, as part of its evidence. One of these meetings took place on May 16, 2006, at 51st Street, S.E. at 4:00 p.m., at the home of Wanda Owens, JACKSON's sister.  BRYANT seeks to minimize the importance of this meeting by pointing out that he is related to Owens and JACKSON.  Regardless, the 51st Street address was one frequently used by members of the conspiracy as a meeting place.  BRYANT explains his call about going to Barry Farms to get the money by saying that his child lived there.  The call, however, is not consistent with this explanation and it would not need to have been so cryptic if he were really discussing his child.

Although he was employed at the time he participated in the conspiracy, BRYANT called JACKSON during the workday from a cellular telephone subscribed to in his own name.  Although he enjoyed family and community support, this too did not deter BRYANT from his crimes. BRYANT met with JACKSON at times when his workday was over, and used his work schedule as an excuse to avoid paying JACKSON on at least one occasion.  He also directed JACKSON to meet him at his home in Maryland when it became clear that JACKSON was frustrated by

BRYANT's failure to pay him.  Evidently, the stability afforded by long-term employment and the personal support he received did not prevent BRYANT from returning to a drug conspiracy.

In his motion, BRYANT claims that the government tried to insinuate that he had several houses, when, he claims he did not and that the government's assertion was without any basis.  At the hearing, the government expressed concern that BRYANT could actually afford to hire an attorney because of his real property holdings.  The government stated that his financial records indicated he might have owned two homes.  BRYANT explained at the hearing via his counsel that he had divested himself of one of the houses he had owned with his wife. BRYANT's records indicate that he actually lives in Waldorf, Maryland.  During the wiretap, months after BRYANT claims to have sold his home in Capitol Heights,  he was heard inviting JACKSON to meet him at "my Capitol Heights house," and stated that he and his wife would be staying at the house on the night of May 14, 2006.  In other calls BRYANT informed JACKSON that he was in Capitol Heights where he could meet to pay JACKSON the money he owed.

Wiretap calls reveal BRYANT talked about money using the kind of coded language for money that is commonly used by drug dealers attempting to avoid detection.  He also discussed "heavy joints" with JACKSON, explaining they were like "the alpha kappa alpha," which experienced agents believed were coded references to a firearm.  BRYANT asserts that is was just familial dialogue when he talked with JACKSON about mixing "collard and kale together." However, when he said this, JACKSON retorted that the joints would be gone because he could move them.[3]

---

[3]    In other calls BRYANT discusses "shaving some off a brick."  This reference may be to cocaine, and the government does not know at this time whether this will become evidence for a superseding indictment at a later time.

At his detention hearing, BRYANT presented the testimony of the attorney he used for the visitation matter for the child he had with a woman in Barry Farms while he was in another relationship and had other children living in his home in Maryland. The attorney had never visited BRYANT's home and knew nothing of him socially. The attorney's testimony consisted of him stating his global admiration for any man who takes an interest in seeing his own children and informing the judge that BRYANT had managed to make his appearances in family court.

2.     When U.S. Magistrate Judge Alan Kay arraigned the defendants, the Government asked the Court to hold them without bail pending trial, in keeping with the Bail Reform Act, 18 U.S.C. § 3142(f)(1)(C).[4] That law presumes that persons should be jailed pending trial when charged with the crimes for which defendants have been indicted, as the defendants herein were. The Court set the matter down for detention hearings on August 4, 2006, for BRYANT, and August 9, 2006 for DOWNS.

3.     At the conclusion of each hearing, Magistrate Judge Kay ordered each defendant held without bond.

## ARGUMENT

4.     This Court should affirm the decision to hold defendants without bail. Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determina-
> tion that Federal bail laws must . . . give the courts adequate authority
> to make release decisions that give appropriate recognition to the
> danger a person may pose to others if released. . . . The constraints

---

[4]     That motion was based on 18 U.S.C. § 3142(f)(1)(C), which authorizes pre-trial detention in any case involving a crime under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, carrying a maximum penalty of ten years or more in prison. All of the crimes charged in the indictment carry such penalties.

of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community.  . . . ***This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.***

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3486-3487. (Emphasis added.)[5]

---

[5] The Court must always consider whether defendant's release is a danger to the community. This point is made throughout the Bail Reform Act.  Section 3142(e), which authorizes detention without bail pending trial, which reads:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required ***and the safety of any other person and the community***, such judicial officer ***shall order*** the detention of the person before trial.

Emphasis added.  Similarly, § 3142(f) reads:

> The judicial officer shall hold a hearing to determine whether any condition of combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person ***and the safety of any other person and the community*** –
>
> (1) upon motion of the attorney for the Government, in a case that involves,
>    (C) an offense for which a maximum term of imprisonment
> of ten years or more is prescribed in the Controlled Substances Act
> (21 U.S.C. § 801 *et seq.*) . . .

Emphasis added.  This point is again made in § 3142(g), **Factors to be considered**, which states:

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required ***and the safety of any other person and the community***, take into account the available information concerning –
>
> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>    (2) the weight of the evidence against the person;
>    (3) the history and characteristics of the person . . .
>    (4) ***the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .***

(Emphasis added.)

5.    No condition of release nor combination of them can ensure that defendants will not pose a danger to the community if released.  This is based first upon the presumption to that effect written into the Bail Reform Act.  18 U.S.C. § 3142(e) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions of release will reasonably assure the . . . safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act.").  This presumption, triggered by indictment, is reinforced overwhelmingly by the facts of the case.

6.    Defendants are in a prolific drug conspiracy that has dumped gallons of PCP onto the streets of Washington, D.C. and Suburban Maryland, and each is a threat to the community if they return to it if released.  Although BRYANT was employed during the time, he seems to have worked around his job to belong to this organization.  In at least one call,  BRYANT is heard discussing a gun in language that, while cryptic, is a familiar code.  DOWNS enjoyed the status of traveler in the group, instead of mere street hustler as he now claims.   Finally, each man knowingly participated in a prolific PCP conspiracy, and each man dealt directly with self-described leader of the group, JACKSON.   These facts embody the danger that defendants' release poses.  As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.  The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .   The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community.

8

S.Rep. No. 225, *supra*, at 3195-3196.

7.      Against these facts, defendants principally rely on community ties to overcome the presumption that they should be held pending trial.  Again, the framers of the 1984 Bail Reform Act thought differently. "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and has no correlation with the question of the safety of the community." S.Rep. No. 225, <u>supra</u>, 3207.  Nor is it clear why community ties, which stopped defendants not at all from selling drugs as described above, now will keep them from doing so again.

8.      Counteracting the representations made by defendants is the seriousness of the charges they face, and the strength of the government's evidence, which the Court must also consider in determining whether the defendants have overcome the presumption that there are no conditions of release that would ensure the safety of the community.  18 U.S.C. § 3142(g).  Substantial seizures of PCP were made from various conspirators throughout this conspiracy investigation.  Even aside from these seizures, the government has wire interceptions demonstrating narcotics-trafficking activities from all of these defendants, and has surveillance and other evidence against most of them, as indicated in the proffer above.  Both of these defendants are charged with Conspiracy to Distribute and Possess with Intent to Distribute PCP; if convicted, defendants face sentences from between twenty years to life without parole.

9.      In addition, BRYANT has criminal record for selling drugs.  While the conviction is many years ago, it is still a part of record that the magistrate judge considered.

In summary, the magistrate judge found that the defendants' release constitutes a clear, convincing danger to the community.  The order releasing them should be upheld and affirmed for the reasons set forth above and for any other reasons appearing at a hearing on this motion.

**WHEREFORE**, the United States respectfully prays this Honorable Court to affirm the findings of the Magistrate Judge to hold them without bond pending trial.

Respectfully submitted,

_____

S. ELISA POTEAT
ASSISTANT UNITED STATES ATTORNEY
D.C. Bar No. 420604
U.S. Attorney's Office
Organized Crime & Narcotics Trafficking Section
555 4th Street, N.W., Room 4120
Washington, DC 20530
(202) 514-7067   FAX:  (202) 514-8707
Elisabeth.S.Poteat@usdoj.gov

_____

EMORY V. COLE
ASSISTANT UNITED STATES ATTORNEY

## CERTIFICATE OF SERVICE

I certify that, on this 22st day of August, 2006, I have caused service of the foregoing to be made by mailing a copy, first-class postage attached, in addition to faxing or emailing to:

**Counsel for defendant Downs:**
James Rudisill, Jr. Esq.
601 Pennsylvania Ave., NW, Suite 310
Washington, D.C. 20004
PH: (202) 783-7908


**Counsel for defendant Bryant:**
Howard Katsoff
717 D Street, N.W., Suite 310
Washington, D.C. 20004
Katsoffh@aol.com
PH: 202-783-6414


_____
S. ELISA POTEAT
ASSISTANT UNITED STATES ATTORNEY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 06-227 (RBW)** |
| | : | |
| **LAWRENCE BRYANT,** | : | **Judge Reggie B. Walton** |
| **JOHN DOWNS,** | : | |
| **Defendants.** | : | |

### ORDER

This matter came before the Court on the defendants' motion for review of a decision by the Magistrate Judge holding the defendants pending trial. Upon consideration of that motion, it is by the Court this _____ day of August 2006

ORDERED, that the defendants shall be held without bond pending trial.

_____
REGGIE B. WALTON,
UNITED STATES DISTRICT JUDGE

cc:

S. Elisa Poteat and Emory V. Cole
Assistant United States Attorneys
U.S. Attorney's Office
Organized Crime & Narcotics Trafficking Section
555 4th Street, N.W., 4th floor
Washington, DC 20530
(202) 514-6997   FAX: (202) 353-9414
Maria.Lerner@usdoj.gov

1

**Counsel for defendant Downs:**

James Rudisill, Jr. Esq.
601 Pennsylvania Ave., NW, Suite 310
Washington, D.C. 20004
PH: (202) 783-7908

**Counsel for defendant Bryant:**

Howard Katsoff
717 D Street, N.W., Suite 310
Washington, D.C. 20004
Katsoffh@aol.com
PH: 202-783-6414