# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCHES OF   )
                                )

**1961 Camelia Court**
**Odenton, Maryland**   )  Case No. 06-3160 WC

**5601 Lundy Drive**
**Lanham, Maryland**   )  Case No. 06-3161 WC

**1918 Black Oak Court**
**Waldorf, Maryland**   )  Case No. 06-3162 WC

**6400 Joe Klutsch Drive**
**Fort Washington, Maryland**   )  Case No. 06-3163 WC

**4727 Brookfield Drive**
**Suitland, Maryland**   )  Case No. 06-3164 WC

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

Your affiant, Special Agent Timothy J. Ervin of the Federal Bureau of Investigation (FBI),

Washington, D.C., having been duly sworn, states the following:

## I.    INTRODUCTION

1.      I have been a Special Agent (SA) with the FBI since 1991. I am currently assigned

to Squad CR-3, which is responsible for conducting investigations which target large scale narcotics

trafficking organizations. From 2002 until September, 2003, I was assigned to investigate counter-

terrorism cases. From 1996 until 2002, I investigated federal narcotics violations which led to the

arrest and conviction of numerous narcotics distributors. Prior to 1996, I was assigned to a counter-

intelligence unit in the FBI. Since 1991, I have received training in the recognition of illicit

narcotics, their common packaging, and the paraphernalia used for ingestion. I have been educated

in the structure of narcotics organizations. I have myself conducted, as well as assisted other law



SW-000093

enforcement officers with drug trafficking investigations and I am familiar with the operations of drug trafficking organizations. I have observed the undercover purchase of controlled substances by confidential informants and police officers on many occasions. I have participated in numerous surveillances, search warrants and arrests of persons involved in violent crimes and illegal drug activity. I have also conducted and participated in debriefings of subjects of narcotics investigations and cooperating individuals.

2.      Based on the experience described in the paragraph above, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other Federal Agents and police officers who are knowledgeable of drug-trafficking investigations, your affiant knows:

(a)      Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Also, these items are generally maintained in the trafficker's residence, or residences of associates, friends or relatives, in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses, or in business locations with which the trafficker is associated and where the trafficker has ready access to these items. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

(b)      Drug traffickers routinely conceal in their residence or the residences of family members, friends and associates, as well as their business locations, and/or in places used by drug



SW-000094

traffickers to conduct their drug distribution activity (such as automobiles, stash houses or safe houses) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions;

      (c)    It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, razors, packaging materials, cutting agents, pots, dishes and other containers for preparing heroin, phencyclidine, cocaine and other controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

      (d)    Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization. These individuals often utilize telephones, cellular telephones and pagers to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses.    Cellular telephones are also frequently used to store the telephone number of other associates of their illegal organization;

      (e)    Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;



SW-000095

(f)     Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities. These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses; and

(g)     Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection. Deposits to bank accounts create an accessible record (or paper trail) of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service (IRS). Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting.

(h)     Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes. Traffickers often keep computers and computer related equipment in their home and utilize the equipment to keep detailed records of their narcotics transactions. Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking. In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an

SW-000096

entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

3.    This affidavit is based, in part, upon information provided to me by other Special Agents of the FBI and DEA, Court-authorized interception of wire communications, information provided by cooperating individuals, controlled purchases of illegal drugs, physical surveillance, and other information gathered during the course of this investigation. Since this affidavit is being submitted for the limited purpose of securing authorization for the search of various places, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the search warrants requested herein. Similarly, while there is reference made in this affidavit to intercepted telephone conversations, only a sampling of pertinent calls are summarized in the document. This is for illustrative purposes, and is by no means an exhaustive list or recitation of the relevant conversations that were intercepted.

4.    As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents of the FBI and DEA who are involved in this investigation, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show that there is probable cause to believe that the fruits, evidence, and instrumentalities of violations of the following federal offenses, among others, are presently to be found at the addresses described in Section II, and further listed in Section V, subsection B, of this affidavit:



SW-000097

    (i)    Possession with intent to distribute and Distribution of controlled substances, in violations of Title 21, United States Code § 841(a)(1);

    (ii)    Use of communication facilities to facilitate the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code § 843(b); and

    (iii)    Conspiracy to commit such offenses, in violation of Title 21 United States Code §841(a)(1), Title 21 United States Code 846 and Title 18 United States Code § 371.

## II.   PROPERTY TO BE SEIZED

1.    Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular PCP, cocaine base, or other controlled substances.

2.    Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers. Storage of names and telephone numbers in cellular telephones.

3.    Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money.

4.    United States currency, precious metals, jewelry and financial instruments, stocks and bonds.

5.    Photographs, in particular photographs of co-conspirators, assets and/or controlled substances.

6.    Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition.

SW-000098

7.      Cellular telephones, pagers and records and receipts reflecting their ownership and use.

8.      Safes, both combination and key type, and their contents.

9.      Indicia of occupancy, residence and/or ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes and keys.

10.     Any and all electronic data processing and storage devices, computers and computer systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

## III.    THE CRIMINAL ORGANIZATION

### (A)    BACKGROUND

5.      Investigation was conducted of a large narcotics distribution organization run by DARNELL ANTHONY JACKSON, also known as "FATS," and TROY ANTIONE HOPKINS. This organization will be referred to herein as the JACKSON/HOPKINS Trafficking Organization, or "JHTO". JACKSON and HOPKINS are phencyclidine (PCP) traffickers who are supplied from Los Angeles by TONY FITZGERALD HILT, also known as "T." Investigation of JACKSON was initiated in November 2005, by the FBI in the Washington, D.C. metropolitan area.

6.      Investigation of JACKSON confirmed he was supplied with gallon quantities of PCP by TONY HILT.   It was also determined that HOPKINS acted as JACKSON's partner in the purchase of PCP from HILT.   JACKSON, HOPKINS and HILT work together to coordinate the transportation of PCP from Los Angeles to the Washington, D.C. Metropolitan Area.   The JHTO



SW-000099

utilizes five couriers to fly the PCP on passenger aircraft from Los Angeles or Long Beach to one of the Washington airports. All five couriers are females residing in Los Angeles (DOMINIQUE WASHINGTON, SHAWNTAE ANDERSON, TINESHA ADAMS, LANIKA FRANKLIN and KEISHAUN JACKSON).

7.    In the Washington Metropolitan Area, JACKSON is assisted in PCP distribution by BERNIE HARGROVE, KEITH ROOTS, also known as "SLOW," CHRISTOPHER DOBBINS, also known as "DOOKIE," DARNELL KINARD JACKSON, also known as "HOMICIDE," ELIJAH HALL and WANDA OWENS. HARGROVE, ROOTS and DOBBINS have all made trips on Jet Blue Airways to Long Beach in order to facilitate the purchase of PCP. DARNELL KINARD JACKSON, also known as "HOMICIDE" (uncle), ELIJAH HALL (father) and WANDA OWENS (sister) are all relatives of DARNELL ANTHONY JACKSON who assist JACKSON in the distribution of PCP. DARNELL KINARD JACKSON is also a distributor of cocaine base.

8.    In the Washington Metropolitan Area, HOPKINS is assisted with PCP distribution by TROY CHAVIOUS, also known as "LITTLE TROY," also known as "L.T." CHAVIOUS has made numerous trips on Jet Blue Airways to Long Beach in order to facilitate the purchase of PCP.

9.    Persons suspected of receiving PCP from JACKSON include, but are not limited to, LAWRENCE BRYANT, WILLIAM HENRY GRAY, also known as "PUNCHY," also known as "P." JOHN DOWNS, also known as "J.D." and JAMES SIMS, also known as "CHICK." JACKSON is known to supply liquid PCP to these persons in amounts ranging from 16 ounces to 64 ounces. The persons who obtain PCP from JACKSON typically supply others who distribute smaller quantities.

Page 8 of 31



SW-000100

10.    Together, the members of the JHTO are engaged in a narcotics conspiracy which is responsible for the distribution of significant amounts of PCP in the greater Washington, D.C. area. JACKSON (assisted by HARGROVE, ROOTS and DOBBINS) and HOPKINS (assisted by CHAVIOUS) obtain liquid PCP in bulk (gallon) quantities from TONY HILT in Los Angeles. They then utilize female couriers (WASHINGTON, ANDERSON, ADAMS, FRANKLIN and KEISHAUN JACKSON) to transport the PCP to the Washington area on passenger aircraft. JACKSON then distributes the PCP to BRYANT, GRAY, DOWNS, SIMS, and others. HOPKINS distributes his portion of the PCP to his own customer base. These drugs eventually make their way to the lowest-level members of the organization who sell the drugs to the actual users.

**(B)    USE OF COOPERATING WITNESSES (CWs)**

11.    During the course of this investigation, information has been provided to the FBI by three cooperating witnesses, who will be referred to herein as "CW-1," "CW-2," and "CW-3." The reporting of these three sources of information has been corroborated to the extent possible by independent investigation, including but not limited to surveillance, controlled purchases of illegal drugs, review of airline records and pen register records, review of wire remitter records, and review of telephone subscriber information.

<u>CW-1</u>

12.    CW-1 has known DARNELL JACKSON for several years. Information provided by CW-1 was obtained through telephone conversations and a meeting with JACKSON. CW-1 has in the past provided the FBI with a substantial amount of information regarding narcotics traffickers in Washington, D.C. Much of the information provided by CW-1 has been corroborated by other



SW-000101

investigation. CW-1 is utilized by the FBI as an operational informant. CW-1 has had a recorded telephone call and recorded meeting with JACKSON. CW-1 is in a position to testify.

## CW-2

13.    CW-2 has known DARNELL JACKSON for years. Information provided by CW-2 was obtained through observation of JACKSON and his associates, as well as frequent conversations with JACKSON. A substantial amount of the information provided by CW-2 has been corroborated by other investigation. CW-2 is utilized by the FBI only as an informational informant. CW-2 does not participate in recorded conversations or meetings. CW-2 is not in a position to testify.

## CW-3

14.    CW-3 has known DARNELL JACKSON for several years. At the direction of the FBI, CW-3 has made controlled purchases of PCP from JACKSON in Washington, D.C. CW-3 is a source of proven reliability. CW-3 has provided information in the past leading to the arrest of a narcotics trafficker and the execution of two narcotics search warrants. CW-3 has made numerous controlled purchases of narcotics from several different distributors at the direction of the FBI. CW-3 is utilized by the FBI as an operational informant. CW-3 has had recorded telephone calls and recorded meetings with JACKSON. CW-3 is in a position to testify.

### (C)    INTERCEPTED COMMUNICATIONS

15.    The intercepted telephone calls summarized below are important for several reasons. First, the calls confirm that the organization, through its members, is actively engaged in the distribution of PCP. Second, these calls illustrate the extent to which JACKSON, HOPKINS and numerous other conspirators are working together to distribute PCP in the Washington, D.C. area.

SW-000102

Third, these calls characterize the relationships between the "interceptees." It is apparent from the both the frequency and the content of the calls how different individuals relate to one another in this large organization. Fourth, these calls corroborate and enhance the physical surveillance conducted by law enforcement.

16.    On May 2, 2006, the Honorable Henry H. Kennedy, United States District Court Judge for the District of Columbia, authorized the interception of wire communications to and from cellular telephone 202-446-4546 [hereinafter referred to as the target telephone]. Monitoring of the target telephone began on May 2, 2006, and concluded on May 26, 2006. Numerous pertinent conversations regarding the purchasing, and selling of PCP and cocaine base were intercepted. The conversations intercepted were often peppered with coded language. Therefore, pertinent intercepts with interpretations of the coded talk are summarized below. The interpretations are made by your Affiant and are based on your Affiant's knowledge of the use of code words/coded language by drug traffickers as well as the facts learned during this investigation. Your Affiant's interpretations appear at the end of some of the call summaries and are indicated by brackets ("[...]"). A sampling of the pertinent calls are detailed below. Each of the summarized calls involved the use of the target telephone.

IV.    **FACTS AND CIRCUMSTANCES WHICH ESTABLISH PROBABLE CAUSE TO SEARCH THE LISTED LOCATIONS**

The following paragraphs summarize the results of this investigation and set forth sufficient probable cause to support authorization of a search warrant for each of the locations particularly described in Section V of this affidavit.

SW-000103

**(A)    CRIMINAL ACTIVITY OF THE MEMBERS OF THE CONSPIRACY**

1.    **TONY FITZGERALD HILT, also known as "T"**

1(a)    TONY HILT is the supplier of PCP to the JHTO. It is known that HILT sells gallon quantities of PCP to JACKSON and HOPKINS from a single family home located at 2406 E. 124th Street, Compton, California.

<u>Intercepted Communications Involving HILT</u>

1(b)    On May 18, 2006, at 9:48 p.m., JACKSON called HILT and said he only had enough money to send HILT 10 [$10,000], but JACKSON insisted he would Western Union the rest to HILT the next day. [JACKSON wanted to purchase a gallon of PCP from HILT, which usually cost between $13,000 and $15,000. JACKSON was hoping HILT would "front" him a portion of the PCP, and JACKSON would later send the remainder of the money to HILT through Western Union.]

1(c)    On May 23, 2006, at 9:31 p.m., HILT called JACKSON and they talked about TINESHA ADAMS and TROY HOPKINS. HILT said he had been in the bathroom of his house "cleaning the things." HILT gave them to TINESHA. [HILT cleaned out bottles in his bathroom which he later filled with PCP and gave to TINESHA ADAMS. The next morning, FBI surveillance observed TINESHA ADAMS and LANIKA FRANKLIN as they arrived at Washington Dulles Airport on a Jet Blue Airways flight from Long Beach, California. They consented to a search of their checked baggage. Seized from ADAMS' baggage were numerous plastic containers which concealed what was determined by the DEA Mid-Atlantic Laboratory to be 3,285.7 grams of PCP. Seized from FRANKLIN's baggage were numerous plastic containers which concealed what was



SW-000104

determined by the DEA Laboratory to be 3,225.7 grams of PCP. The DEA qualitative analysis of that PCP is not yet complete.]

<u>Investigation on March 9-10, 2006</u>

1(d)    On March 9, 2006, JACKSON and CW-3 arranged to fly together on Jet Blue Airways to purchase PCP from Los Angeles. As a result, FBI agents met with CW-3 in the early morning hours to provide CW-3 with a vehicle with interior audio and video recording equipment. Agents also provided CW-3 with $7,500 to be used to purchase a portion of the PCP which JACKSON would be obtaining. Later that morning, FBI surveillance at Washington Dulles Airport observed JACKSON and CW-3 boarding Jet Blue flight 311 departing at 7:20 a.m., scheduled to arrive in Long Beach at 10:00 a.m. Pacific Standard Time [PST].

1(e)    Soon after their arrival in Long Beach, CW-3 indicated JACKSON called "T" (TONY HILT). At approximately 1316 hours, FBI agents surveilled JACKSON as he left a Best Western Hotel in Inglewood, California. JACKSON and DOMINIQUE WASHINGTON were observed riding in a rental car. They were followed to the Isee Beauty Supply store on Century Boulevard. JACKSON and WASHINGTON went into the store and came out with WASHINGTON carrying a white plastic bag [your affiant believes they purchased the shampoo bottles which would be used to conceal PCP - see additional information below].

1(f)    JACKSON and WASHINGTON were then followed to a single family home located at 2406 E. 124th Street, Compton, California. JACKSON waited in front of the house until TONY HILT pulled into the driveway in a red Dodge. JACKSON was then observed walking towards the house. WASHINGTON also later walked towards the house. JACKSON and WASHINGTON were later observed walking with HILT as they returned to the vehicle, which left

SW-000105

the area. JACKSON was carrying a bag as he got back into the vehicle [your affiant believes JACKSON was carrying the PCP he had just purchased from HILT].

1(g)    Later that evening, CW-3, JACKSON and WASHINGTON went to WASHINGTON's apartment. The exact location of the apartment is not known to law enforcement. CW-3 watched as JACKSON and WASHINGTON emptied four 32 ounce bottles containing shampoo or hair care products. They then cleaned the empty plastic bottles. CW-3 then observed a one gallon Arizona Tea bottle which was filled with PCP. JACKSON took out a funnel and poured 32 ounces of PCP from the gallon bottle into each of the four plastic bottles. JACKSON gave WASHINGTON his suitcase and she packed it with clothes and the four plastic bottles. JACKSON and CW-3 later went to the Long Beach Airport, where they watched WASHINGTON purchase her ticket for travel on Jet Blue, then check her bag and proceed toward the gate.

1(h)    On March 10, 2006, Jet Blue flight 255 arrived at Dulles Airport from Long Beach at approximately 5:00 a.m. An FBI agent surveilled WASHINGTON as she exited the plane. WASHINGTON was followed to the baggage carousel, where she collected a black rectangular bag. WASHINGTON then got a taxi and was followed to a Days Inn in Camp Springs, Maryland. She checked into the hotel under the name DOMINIQUE MICHELLE.

<u>First Controlled Purchase of PCP</u>

1(i)    That same evening [March 10, 2006], JACKSON and CW-3 flew back to Dulles Airport on Jet Blue flight 307, landing at approximately 6:35 p.m.    Shortly after returning to Dulles, JACKSON and CW-3 re-entered the undercover vehicle, which was parked in an airport parking structure.



SW-000106

1(j)    A review of the audio and video recording device inside the undercover vehicle revealed the following comments were made by JACKSON:

1853 hours - JACKSON asked if CW-3 knew where BERNIE [HARGROVE] lived.

1917 hours - JACKSON instructed CW-3 how to dilute PCP, saying "...it ain't nothing, it's easy.   You take a 16 [ounce quantity] of starter fluid, get a gallon container, pour the 32 ounces in the 16 and shake it up.  Then you put the other 32 in there and shake it up...that's it."

1921 hours - JACKSON spoke about his Los Angeles supplier of PCP.  JACKSON said they "cook" PCP on the 1st and 15th day of each month in Los Angeles.  Each time they cook, they make about 50 gallons.  The supplier is glad JACKSON is regularly coming back again now, because JACKSON used to buy 16 to 22 gallons of PCP from the supplier each month.  JACKSON said that he once made $500,000 in 30 days distributing PCP.    JACKSON had BERNIE [HARGROVE] going to Los Angeles so much that BERNIE got jet lag and said he wasn't going anymore.

1942 hours - JACKSON said that DOMINIQUE [WASHINGTON] is the one who controls the female couriers.  Then JACKSON corrected himself and said that TINESHA [ADAMS] is actually the one who controls the couriers.  JACKSON pays TINESHA $1,000 for each gallon transported to Washington, but TINESHA keeps $500 for herself and only pays the couriers $500 for each gallon transported.

1(k)    At approximately 1922 hours, JACKSON was heard speaking on a phone call with BERNIE HARGROVE. JACKSON told HARGROVE they were on the way there.  A review of the pen register on the target telephone confirmed the call to HARGROVE's number, 202-271-4207.

SW-000107

1(l)    At approximately 1928 hours, JACKSON received a cell phone call from a man he called "J.D." (JOHN DOWNS).  JACKSON told DOWNS "it is going down."  As JACKSON had the target telephone in the speaker phone mode, DOWNS could be heard saying he was ready.  A review of the pen register on the target telephone confirmed the call with DOWNS' telephone, 443-871-0607.  It should be noted that JACKSON had previously told CW-3 the majority of PCP he was bringing back to Washington would be sold to a man from Annapolis, Maryland who was nicknamed "J.D."

1(m)    FBI agents surveilled the undercover vehicle from Dulles Airport to 3323 10th Place, S.E., Washington, D.C.  CW-3 advised the FBI that BERNIE [HARGROVE] lives in an apartment in that building.  Upon entering that apartment, CW-3 and JACKSON were met by HARGROVE and ROOTS.  JACKSON took all four plastic 32 ounce bottles and poured them into a gallon bottle.  JACKSON shook the gallon bottle, then re-filled two of the 32 ounce bottles and gave them to CW-3.  JACKSON had sent ROOTS out to get smaller bottles, and said he would pour out his PCP later.  CW-3 then left HARGROVE's apartment and returned to the staging area in the undercover vehicle.  At that location, CW-3 turned over two 32 ounce bottles of a substance which appeared to be PCP.

1(n)    The liquid substance CW-3 obtained from JACKSON was seized by the FBI and submitted to the DEA Mid-Atlantic Laboratory for quantitative and qualitative analysis.  The DEA Laboratory determined the substance was PCP with a weight of 1425 grams and a purity of 55%.



SW-000108

<u>Travel by Couriers</u>

1(o)     As was noted above, HILT, JACKSON and HOPKINS used five couriers to transport PCP from Los Angeles to the Washington Metropolitan Area.  JACKSON instructed CW-3 that each courier brings one gallon at a time.  Review of records obtained from Jet Blue Airways determined that during the period September 1, 2005 to June 1, 2006, TINESHA ADAMS made 11 round-trip flights from Long Beach Airport (LGB) to Washington Dulles Airport (IAD); SHAWNTAE ANDERSON made 11 round-trip flights from LGB to IAD; DOMINIQUE WASHINGTON made seven round-trip flights from LGB to IAD; KEISHAUN JACKSON made four round-trip flights from LGB to IAD; and LANIKA FRANKLIN made three round-trip flights from LGB to IAD.  Your affiant believes each of those trips represents a gallon of PCP being transported from HILT in Los Angeles to JACKSON and HOPKINS in the Washington Metropolitan Area.

2.     **DARNELL ANTHONY JACKSON, also known as "FATS"**

2(a)     DARNELL JACKSON and his partner, TROY HOPKINS, appear to be responsible for coordinating the purchase of PCP from TONY HILT in Los Angeles, the importation of PCP into the Washington Metropolitan Area and the distribution of PCP to their customers.  Numerous pertinent calls and surveillance observations involving JACKSON are summarized above and below.

<u>Second Controlled Purchase of PCP</u>

2(b)     On May 23, 2006, CW-3 met with FBI agents and was provided with a recording device and $10,000 to be "fronted" to JACKSON for the future delivery of PCP.  CW-3 met with JACKSON at 1961 Camelia Court, Odenton, Maryland.  Upon entering that residence,



SW-000109

CW-3 saw JACKSON and TROY HOPKINS. CW-3 gave JACKSON $10,000 in JACKSON's bedroom. CW-3 noticed that JACKSON had three large bundles of U.S. currency on his bed. The CW's trip to 1961 Camelia Court was confirmed by FBI surveillance. A short time after CW-3 left, JACKSON and HOPKINS were observed by surveillance exiting 1961 Camelia Court.

2(c)    On May 24, 2006, CW-3 met with FBI agents and was provided with a recording device. CW-3 then met with JACKSON inside his sister's residence, 741 51st Street, S.E., Washington, D.C. In the living room, JACKSON gave CW-3 a plastic bag containing a bottle of what appeared to be liquid PCP. CW-3 then left the residence and returned to the staging area, where CW-3 turned the substance over to the FBI. The meeting between JACKSON and CW-3 at 741 51st Street was confirmed by FBI surveillance. The liquid substance CW-3 obtained from JACKSON was seized by the FBI and submitted to the DEA Mid-Atlantic Laboratory for quantitative and qualitative analysis. The DEA Laboratory determined the substance was PCP with weight of 774.3 grams and a purity of 36%.

### Third Controlled Purchase of PCP

2(d)    On June 13, 2006, CW-3 met with FBI agents and was provided with a recording device and $4,000 to be fronted to JACKSON for the future delivery of PCP. CW-3 met with JACKSON at 741 51st Street, S.E., Washington, D.C., and gave JACKSON $4,000. The meeting between CW-3 and JACKSON was confirmed by FBI surveillance.

2(e)    On July 5, 2006, CW-3 met with JACKSON at 741 51st Street, S.E., Washington, D.C. JACKSON surprised CW-3 by saying he was ready to give CW-3 PCP at that time, and told CW-3 to follow him. As CW-3 followed JACKSON's vehicle, CW-3 called the FBI and said CW-3 was following JACKSON to Elvans Road, S.E., Washington, D.C. to obtain PCP.

SW-000110

Once they arrived on Elvans Road, CW-3 watched as JACKSON entered the apartment building at 2416 Elvans Road, S.E., Washington, D.C. A short time later, JACKSON exited that address, then gave the PCP to CW-3. FBI surveillance arrived in the area as CW-3 was driving away from the 2400 block of Elvans Road, and confirmed that one of JACKSON's vehicles was parked in front of 2416 Elvans Road. CW-3 then went to a staging area and turned over the PCP to the FBI. The liquid substance CW-3 obtained from JACKSON was submitted to the DEA Mid-Atlantic Laboratory for quantitative and qualitative analysis. The DEA Laboratory determined the substance was PCP with a weight of 348.8 grams. The DEA qualitative analysis is not complete.

### 3.    BERNIE HARGROVE

3(a)    BERNIE HARGROVE is a resident of Washington, D.C., who assists JACKSON in the distribution of PCP. As was mentioned above, the first controlled purchase of PCP took place in HARGROVE's apartment. Review of records obtained by the FBI from Jet Blue Airways determined that HARGROVE flew with DARNELL JACKSON on a Jet Blue flight from Washington Dulles to Long Beach on January 17, 2006. They returned to Washington Dulles on a flight on January 18, 2006.

### 4.    KEITH ROOTS, also known as "SLOW"

4(a)    KEITH ROOTS is another resident of Washington, D.C., who assists JACKSON in the distribution of PCP. Review of records obtained by the FBI from Jet Blue Airways determined that ROOTS twice flew with DARNELL JACKSON on Jet Blue flights from Washington Dulles to Long Beach. The dates of those two round-trip flights are March 14 - March 15, 2006 and April 4 - April 5, 2006.



SW-000111

<u>Investigation on April 4 - April 5, 2006</u>

4(b)    On April 4, 2006, at approximately 6:15 a.m., FBI surveillance at Dulles Airport observed JACKSON and ROOTS check-in at the counter for Jet Blue flight 311, departing Dulles at 7:20 a.m., arriving in Long Beach at 10:00 a.m. They checked two black rectangular bags. Jet Blue records showed JACKSON and ROOTS were scheduled to fly back to Washington Dulles on April 5, 2006, at 3:45 p.m.

4(c)    On April 5, 2006, at approximately 5:00 a.m., FBI surveillance agents at Dulles Airport observed DOMINIQUE WASHINGTON coming off Jet Blue flight 255 from Long Beach. WASHINGTON was followed to the baggage carousel, where she collected a black rectangular bag. WASHINGTON got a taxi and was followed to a Days Inn in Camp Springs, Maryland. WASHINGTON waited in the lobby until she was picked up by ELIJAH HALL, who was driving a Ford Taurus. They were followed to 5808 Folgate Court, Capitol Heights, Maryland, where HALL resides.

4(d)    At approximately 5:53 p.m., FBI surveillance agents observed JACKSON and ROOTS arrive at 5808 Folgate Court in a Jaguar driven by JACKSON. Both men went into the residence. Later that evening, CW-3 went to 5808 Folgate Court to meet with JACKSON. Upon entering that residence, CW-3 noted WASHINGTON was in the home with JACKSON and HALL. CW-3 saw two 32 ounce plastic shampoo bottles drying in the kitchen sink. JACKSON told CW-3 he had just returned from a trip to Los Angeles, and WASHINGTON had transported a gallon of PCP back to Washington.

4(e)    A review of the pen register on the target telephone revealed a call to JOHN DOWNS' number, 443-871-0607, at 1651 hours on April 5, 2006. As Jet Blue records indicate



SW-000112

flight 304 from Long Beach landed at Dulles Airport at 1538 hours, it appears JACKSON once again called DOWNS shortly after landing in Washington.

### 5.    CHRISTOPHER MICHAEL DOBBINS, also known as "DOOKIE"

5(a)    CHRISTOPHER DOBBINS is another resident of the Washington, D.C. area who assists JACKSON in the distribution of PCP.    Review of records obtained by the FBI from Jet Blue Airways determined DOBBINS flew on Jet Blue from Washington Dulles to Long Beach on April 24, 2006.    He returned to Washington Dulles on a flight on April 27, 2006.

<u>Intercepted Communications Involving DOBBINS</u>

5(b)    On May 20, 2006, at 12:12 p.m., JACKSON called DOBBINS and told him to go to the Holiday Inn in College Park, Maryland, room 1406, and pick up "that" from TROY [HOPKINS].

5(c)    On May 20, 2006, at 12:14 p.m., JACKSON again called DOBBINS and said when DOBBINS got to the Holiday Inn, he should get two Gatorade 32 ounces and one Everfresh 16 ounce.    JACKSON also said when DOBBINS brought it to him, JACKSON would give DOBBINS $400. [JACKSON sent DOBBINS to the Holiday Inn to obtain two 32 ounce bottles and one 16 ounce bottle of PCP from TROY HOPKINS.]

<u>Investigation on May 19 - May 20, 2006</u>

5(d)    Review of records obtained by the FBI from Jet Blue Airways determined SHAWNTAE ANDERSON flew on Jet Blue from Long Beach to Washington Dulles, arriving on the evening of May 19, 2006, at 11:50 p.m.    Investigation at the Holiday Inn at 1000 Baltimore Avenue, College Park, Maryland, determined that SHAWNTAE ANDERSON checked into room 1406 on May 20, 2006 at approximately 6:00 a.m. The hotel has a security camera in the lobby area.

Page 21 of 31



SW-000113

Review of that video for the morning of May 20, 2006 showed ANDERSON arriving in the lobby with TROY HOPKINS.

### 6.    TROY ANTIONE HOPKINS

6(a)    TROY HOPKINS and DARNELL JACKSON are partners.    They are responsible for coordinating the purchase of PCP from TONY HILT in Los Angeles, the importation of PCP into the Washington Metropolitan Area and the distribution of PCP to their customers.

#### Intercepted Communications Involving HOPKINS

6(b)    On May 13, 2006, at 8:27 a.m., HOPKINS called JACKSON and said he just got two back, and he wanted to know if JACKSON could help him get rid of them. JACKSON said "let me get one of them."    JACKSON said he would want to put at least a 16 or a 32 on it, but HOPKINS said he did not want to do that. [HOPKINS got two gallons of PCP back from Los Angeles.  He wanted JACKSON to help him sell the PCP. JACKSON suggested that HOPKINS sell one of the gallons of PCP to him.   However, they disagreed about whether or not JACKSON should dilute the PCP by adding 16 or 32 ounces of "cut" to it.]

### 7.    TROY CHAVIOUS, also known as "LITTLE TROY," or "L.T."

7(a)    TROY CHAVIOUS is a resident of the Washington, D.C. area who assists HOPKINS in the distribution of PCP.   Review of records obtained by the FBI from Jet Blue Airways determined CHAVIOUS flew round-trip on Jet Blue from Washington Dulles to Long Beach on six occasions between February 7, 2006 - May 19, 2006.

#### Intercepted Communications Involving Chavious

7(b)    On May 18, 2006, at 11:48 p.m., TROY HOPKINS used the target telephone to call a female in Los Angeles. HOPKINS told the female that he was looking for CHAVIOUS.



SW-000114

HOPKINS told the female that she and CHAVIOUS should take the "change" to TONY and get "that" now. [It is believed the female in this conversation is SHAWNTAE ANDERSON. As was noted above, ANDERSON transported PCP to Washington Dulles Airport on the evening of May 19, 2006. Jet Blue Airways records showed that CHAVIOUS flew from Washington Dulles to Long Beach on May 18, 2006, arriving at 11:10 p.m. HOPKINS tells her that she and CHAVIOUS should take the money to TONY HILT now and get the PCP.]

7(c)     On May 22, 2006, at 3:50 p.m., JACKSON called CHAVIOUS and asked him to take a "teenager" to the Safari Steakhouse and meet a guy who was driving a green Tahoe. JACKSON said the guy should give CHAVIOUS "33." [A "teenager" is code for 16 ounces of PCP. JACKSON directed CHAVIOUS to take that amount to meet a customer at a restaurant on Annapolis Road and sell it for $3,300.]

## 8.     LAWRENCE BRYANT

8(a)     LAWRENCE BRYANT is a distributor of PCP in the Washington Metropolitan Area. He is supplied with PCP by DARNELL JACKSON.

### Intercepted Communications Involving BRYANT

8(b)     On May 13, 2006, at 8:03 p.m., JACKSON called BRYANT. BRYANT told JACKSON he needed to see him right now. JACKSON told BRYANT he needed to get the "cheese" as soon as possible. BRYANT said that he and JACKSON could ride around together for an hour and get like 20. They arranged to meet. [BRYANT wanted to see JACKSON to get PCP. JACKSON told BRYANT he needed money, or cheese. BRYANT indicated that he and JACKSON could ride around together and collect about $20,000 in drug proceeds.]



SW-000115

8(c)    On May 15, 2006, at 3:22 p.m., JACKSON called BRYANT. BRYANT told JACKSON that the "joints" are gone. JACKSON asked if BRYANT had the change? BRYANT said yes, give me until 7:00 p.m. tonight and I will have everything. [BRYANT sold all the PCP he received from JACKSON. BRYANT indicated he would have all of JACKSON's money by 7:00 p.m. that evening.]

8(d)    On May 16, 2006, at 12:27 p.m., JACKSON called BRYANT and said he needed to see BRYANT to get "that." They arranged to meet later that day at JACKSON's sister's house at 4:00 p.m. [JACKSON was still trying to collect the money from BRYANT. FBI surveillance confirmed JACKSON and BRYANT met at JACKSON's sister's house, 741 51st Street, S.E., Washington, D.C., that afternoon at approximately 4:00 p.m. BRYANT was driving a maroon Chevy Tahoe.]

9.    **WILLIAM HENRY GRAY, also known as "PUNCHY," or "P"**

9(a)    WILLIAM GRAY is a distributor of PCP in the Washington Metropolitan Area. He is supplied with PCP by DARNELL JACKSON.

### Intercepted Communications Involving GRAY

9(b)    On May 13, 2006, at 8:41 a.m., GRAY called JACKSON and said he wanted a half. JACKSON told GRAY he is charging 16 for a half. GRAY said he only had 10. JACKSON said for that amount he could give GRAY three sodas at a price of $3,350 each. [GRAY wanted to buy a half gallon of PCP. JACKSON said the price would be $16,000. GRAY said he only had $10,000. JACKSON offered to sell GRAY three 16 ounce quantities of PCP at $3,350 each.]



SW-000116

9(c)    On May 13, 2006, at 11:59 a.m., GRAY called JACKSON and they agreed to meet at the Safari Steakhouse on Route 450 in Lanham, Maryland.  [FBI surveillance observed GRAY and JACKSON meeting at the Safari Steakhouse at 12:44 p.m.  JACKSON left his meeting with GRAY and was followed to TROY HOPKINS' residence, 5601 Lundy Drive, Lanham, Maryland.   After several minutes at that residence, JACKSON was followed back to a second meeting with GRAY at the Safari Steakhouse.  Your affiant believes JACKSON obtained money from GRAY during their first meeting, which he took to HOPKINS in exchange for PCP, which he gave to GRAY at their second meeting.]

10.    **DARNELL KINARD JACKSON, also known as "HOMICIDE"**

10(a)   HOMICIDE JACKSON assists his nephew, DARNELL JACKSON, in the distribution of PCP.  HOMICIDE JACKSON is also a distributor of cocaine base in the Washington Metropolitan Area.

<u>Intercepted Communications Involving HOMICIDE JACKSON</u>

10(b)   On May 6, 2006, at 9:36 p.m., HOMICIDE JACKSON spoke with DARNELL JACKSON.  HOMICIDE said he spoke with the guy, and the guy told him it was "more than 28 whatcha call it... they charged us $1,500." DARNELL told HOMICIDE that he had to see it, and that HOMICIDE had to have patience and take his time.  HOMICIDE responded by saying "I know it ain't no garbage, I know that."  [HOMICIDE told DARNELL that he got more than 28 grams of cocaine and was charged $1,500.  DARNELL then advised HOMICIDE to be careful and not seem so anxious.  HOMICIDE told DARNELL that he knows he got good quality cocaine.]

10(c)   On May 10, 2006, at 9:51 a.m.,  DARNELL spoke to HOMICIDE. DARNELL said he had spoken to DOOKIE [CHRISTOPHER DOBBINS], who said that the little



SW-000117

stuff was $1500. HOMICIDE told DARNELL that it was 50, because he weighed it. DARNELL told HOMICIDE that it was still too much, and continued by telling HOMICIDE that he will not make anything. DARNELL concluded by telling HOMICIDE that he could get "6 deuce for 15." [HOMICIDE told DARNELL that he paid $1,500 for cocaine which weighed 50 grams. DARNELL said he paid too much, and that he will not be able to make a profit buying that amount of cocaine at that price. DARNELL told HOMICIDE he could have gotten 62 grams of cocaine for a price of $1,500.]

10(d)   On May 21, 2006, at 1:19 p.m., TROY HOPKINS called DARNELL JACKSON. DARNELL reminded HOPKINS, "I told you my uncle [HOMICIDE JACKSON] needs you to do that for him." HOPKINS asked "...he got all the utensils?" DARNELL told HOPKINS, yeah I got everything. [DARNELL JACKSON asked HOPKINS to convert or cook cocaine hydrochloride into cocaine base. HOPKINS wanted to make sure they had all the necessary utensils to cook the cocaine.]

10(e)   On May 21, 2006, at 4:39 p.m., HOMICIDE called DARNELL and asked if DARNELL had him on the speaker phone. DARNELL told HOMICIDE that he did not. HOMICIDE then told DARNELL he did not want all those guys coming to the house where he had the "shit.". DARNELL told HOMICIDE to stop to get some bake and a scale. HOMICIDE told DARNELL that he already had a scale. DARNELL then told HOMICIDE to get a box of baking soda. [HOMICIDE began by making sure that no one else could hear his conversation with DARNELL. DARNELL then told HOMICIDE that he had to stop to get baking soda and the scale. Baking soda is commonly used in converting powder cocaine into crack cocaine.]

SW-000118

**(B)    LINKS BETWEEN CRIMINAL ACTIVITY OF MEMBERS OF THE JHTO AND LOCATIONS TO BE SEARCHED**

For reasons detailed in Section I, it is likely that the items detailed in Section II related to PCP trafficking activity by the JHTO are present in the locations detailed below.

**1961 Camelia Court, Odenton, Maryland**

DARNELL JACKSON resides at this address. JACKSON's vehicles have been observed at this address on numerous occasions, most recently on July 19, 2006. JACKSON has also been observed exiting this residence on several occasions. TROY HOPKINS has also been observed at this residence. As was noted above, on May 23, 2006, CW-3 entered this residence to make a controlled payment of $10,000 to JACKSON.

**5601 Lundy Drive, Lanham, Maryland**

TROY HOPKINS and TROY CHAVIOUS have been observed by FBI surveillance at this residence on numerous occasions.    TROY HOPKINS' father resides at this address.    TROY HOPKINS is also believed to reside at this address on a part time basis.    The residential telephone subscribed to this address, 301-577-8502, was used numerous times by TROY HOPKINS to participate in pertinent conversations with DARNELL JACKSON on the target telephone.    The cellular telephone used by TROY CHAVIOUS during pertinent calls with DARNELL JACKSON, 301-741-0981, is also subscribed to this address.    DARNELL JACKSON and CHRISTOPHER DOBBINS have been observed by surveillance entering and exiting this residence.    CHAVIOUS and HOPKINS have been observed at this residence as recently as July 20, 2006.

**1918 Black Oak Court, Waldorf, Maryland**

LAWRENCE BRYANT resides at this address. As was noted above, on May 16, 2006, BRYANT was driving a maroon Chevy Tahoe when he met with DARNELL JACKSON at 741 51st

SW-000119

Street, S.E., Washington, D.C., in order to give JACKSON narcotics proceeds. On the mornings of June 5, 2006, July 13, 2006 and July 19, 2006, a maroon Chevy Tahoe with Maryland tag M267356 was observed parked in front of 1918 Black Oak Court, Waldorf, Maryland. The registered owners of the vehicle are LAWRENCE BRYANT and Chicquita Lashon Bryant. LAWRENCE BRYANT's address on the vehicle's registration is listed as 1918 Black Oak Court, Waldorf, Maryland. The cellular telephone used by BRYANT, 240-304-2707, was frequently used to call JACKSON on the target telephone. That cellular telephone is subscribed to LAWRENCE BRYANT at 1918 Black Oak Court, Waldorf, Maryland.

### 6400 Joe Klutsch Drive, Fort Washington, Maryland

WILLIAM GRAY resides at this address. During interception of the target telephone, FBI surveillance observed GRAY meeting with JACKSON on three occasions. On two of those occasions, GRAY was driving a white Lexus with D.C. license CG 5983. FBI surveillance on the morning of June 5, 2006, noted the white Lexus with D.C. license CG 5983 was parked next to 6400 Joe Klutsch Drive. On the morning of July 13, 2006 and during the afternoon on July 20, 2006, the same white Lexus was again observed parked next to 6400 Joe Klutsch Drive, but the license plate had been changed to Maryland registration. On the morning of July 19, 2006, a Jaguar registered to GRAY was observed parked in the driveway of this residence. GRAY's Maryland driver's license lists his address as 6400 Joe Klutsch Drive, Fort Washington, Maryland.

### 4727 Brookfield Drive, Suitland, Maryland

DARNELL KINARD JACKSON, also known as HOMICIDE JACKSON, resides at this address with his girlfriend. On May 12, 2006, a call was intercepted between HOMICIDE JACKSON and DARNELL JACKSON in which HOMICIDE gave DARNELL directions to meet



SW-000120

him at a house on Brookfield Drive. FBI surveillance later that day confirmed that the Jaguar driven by DARNELL JACKSON was parked near 4727 Brookfield Drive, Suitland, Maryland. On July 13, 2006, a conversion van with Ohio license plates owned by DARNELL JACKSON was followed to 4727 Brookfield Drive, Suitland, Maryland. Occupants of the van were observed going into 4727 Brookfield Drive. They later came out of that address and were followed to a grocery store. At that time, HOMICIDE JACKSON and an unknown female were observed exiting the vehicle. They later returned to the vehicle and were followed back to 4727 Brookfield Drive. On the morning of July 25, 2006, the conversion van owned by DARNELL JACKSON was again observed parked in front of 4727 Brookfield Drive, Suitland, Maryland. It is believed that DARNELL JACKSON often allows his uncle, HOMICIDE JACKSON, the use of this vehicle.

## V.    PARTICULARIZED DESCRIPTIONS OF LOCATIONS TO BE SEARCHED

This affidavit is respectfully submitted in support of an application for the issuance of search warrants for numerous locations associated with JACKSON, HOPKINS and their drug-trafficking associates and co-conspirators. Authority to search the following locations is sought herein:

### 1961 Camelia Court, Odenton, Maryland

The property commonly known as 1961 Camelia Court, Odenton, Maryland, is described as a three level attached townhouse. It is constructed of red brick. The shutters are brown in color. The numbers "1961" appear in black on a storage shed in front of the home.

### 5601 Lundy Drive, Lanham, Maryland

The property commonly known as 5601 Lundy Drive, Lanham, Maryland, is described as a single family home with green siding over white brick and a two car garage. The numbers "5601" appear in brass above the main entrance door. The main entrance door is white in color. There is also a white grate screen door in front of the main door.



SW-000121

### 1918 Black Oak Court, Waldorf, Maryland

The property commonly known as 1918 Black Oak Court, Waldorf, Maryland, is described as a split level single family home with off-white siding and brick. The numbers "1918" appear in gold above the main entrance door, which is constructed of stained glass. There is a tan colored storage shed in the rear of the house.

### 6400 Joe Klutsch Drive, Fort Washington, Maryland

The property commonly known as 6400 Joe Klutsch Drive, Fort Washington, Maryland, is described as a three level end townhouse. The siding on the home is off-white. The numbers "6400" appear in black to the left of the main entrance door. The shutters and the main entrance door are dark green in color.

### 4727 Brookfield Drive, Suitland, Maryland

The property commonly known as 4727 Brookfield Drive, Suitland, Maryland, is described as a two level duplex with red brick on the lower level and white siding on the upper level. The residence is on the left side of the duplex as you face the front. The numbers "4727" appear above the main entrance door in black on an awning over the door. The main entrance door is constructed of brown wood, and there is a glass screen door with white trim.

## VI.    CONCLUSION

Based on the foregoing information, I submit that there is probable cause to believe that

HILT, JACKSON, HOPKINS and their criminal associates are involved in an ongoing conspiracy

to distribute and possess with intent to distribute PCP and cocaine base, and that within the

aforementioned target locations are evidence and instrumentalities of the crimes of conspiracy to

distribute and possess with intent to distribute, and distribution and possession with intent to

distribute, illegal narcotics, as more particularly set forth in Section II of the application for the

issuance of the search warrants.

Special Agent Timothy J. Ervin
Federal Bureau of Investigation
Washington Field Office

Page 30 of 31

SW-000122

Sworn to and subscribed before me this 27th day of July, 2006.

William Connelly
United States Magistrate Judge

SW-000123